DAVID M. PORTER *v.* ROBERT B. DUGLASS.

Where a bill of exceptions purports to set out the evidence in a cause, it will be presumed that it contains the whole of the evidence, or the substance of the evidence, unless the contrary appears from the bill, or from some other part of the record.

• If the facts of a case are admitted and established by the agreement of parties litigant, it will constitute as good a foundation on which to base the judgment of the court, as the facts established by the evidence would form.

Where a party has been by a decree of the proper court declared a bankrupt, all his property of every description is by the operation of the bankrupt law, *ipso facto* from the time of such decree deemed to be out of such bankrupt, and is by force of said decree vested in the assignee, who is empowered to sell, manage, and dispose of the same, to sue for and defend the same in all cases, as if the same were vested in or might be exercised by said bankrupt, before or at the time of his bankruptcy : — *Held,* that by this provision of the bankrupt act the assignee could not maintain an action to recover property conveyed by the bankrupt before the decree, which the bankrupt himself could not maintain if there had been no decree in bankruptcy, (except in cases specified in the second section of said act,) however fraudulent and void as to creditors such conveyance may have been.

The second section of the bankrupt act provides, " that all future payments, securities, conveyances, or transfers of property or agreements made or given by any bankrupt, and for the purpose of giving any creditor, indorsee, security, or other person, any preference or priority over the general creditors of such bankrupt, and all other payments, securities, conveyances, or transfers of property or securities made or given by such bankrupt in contemplation of bankruptcy, to any person or persons whatsoever not being a *bonâ fide* creditor, or purchaser for a valuable consideration without notice, shall be deemed utterly void, and a fraud upon this act," and the assignee under the bankruptcy " shall be entitled to claim, sue for, and recover and receive the same as part of the assets of the bankruptcy " : — *Held,* that the

Porter *v.* Duglass.

interest and title of P. to the slaves in controversy were completely divested by this conveyance and the execution sales.

The transfer and the sales under execution of the slaves were not made in contemplation of the passage of the bankrupt act, nor in violation of its provisions, consequently the assignee could not have recovered the slaves as assets belonging to the bankrupt.

The issue which arises in this case is, whether the bankrupt (P.) in rendering the schedule of his property, in his omission to include the slaves, was an act of wilful concealment of his property, or right of property : — *Held*, that the conveyance of the slaves to Mrs. P. was made *bonâ fide*, and it did not vest P., the bankrupt, with any title or right to the property, and the slaves could not have been recovered by the assignee in bankruptcy.

In error from the circuit court of Madison county; Hon. Robert C. Perry, judge.

This was a suit instituted by the appellee against plaintiff in error and William P. Anderson, on their joint note. Each defendant below filed his plea of the certificate of his discharge in bankruptcy, under the act of congress of 1841. The suit was subsequently dismissed as to Anderson. To Porter's plea, the plaintiff below replied that Porter in his schedule failed to surrender certain specified property, slaves, and a house and lot, &c., alleged to be his property, and that this failure was a wilful concealment of his property contrary to the provisions of said act of congress. To which Porter rejoined, (protesting that said property in said replication was not his,) that the failure to surrender the same was not a wilful concealment by him of his property contrary to said act. And, on this point, an issue was made by the parties.

On the trial the plaintiff below introduced a witness, John J. Lamar, who testified that the negroes, mentioned in the replication, were in the early part of 1839 on Porter's plantation, and he claimed them; that Porter sold said plantation and negroes to Robert Shotwell in June, 1839, including the negroes in the replication. Witness learned from Porter about the last of 1839 or first of 1840, that Porter had Shotwell bound in writing to convey these negroes named in the replication to Porter's wife. These negroes, with all others on the plantation, were brought to Canton by Porter, and all were sold under executions based upon judgments against Porter. Shotwell bought them

all at said sale.   That witness saw them afterwards in Porter's possession, about his house at different times in the years 1841 and 1842.   The others were carried back to the plantation. That those named in the replication were controlled by Porter and his wife all the time, both before and after Porter's bankruptcy.   Porter removed from Madison county after his bankruptcy; witness thinks after the year 1843.   Shotwell's first purchase from Porter was in the spring of 1839, and the second contract the last of 1839 or first of 1840.   It was admitted that the negroes named in the replication were not named in the schedule in bankruptcy.   Porter's counsel then read a deed of gift of the negroes named in the replication to Mrs. Porter, from Shotwell, executed and dated June 8, 1840, and proved by Shotwell that in June, 1839, he purchased Porter's plantation and negroes, upwards of thirty in number, including those named in the deed of gift, for $50,000, $36,000 of which to be paid in notes on divers persons, and the balance in Porter's liabilities, for which property Porter executed his deed, which was duly recorded; and it was at the same time agreed between them, that Porter should have the privilege of repurchasing the property, if he could, at any time within eight years.   In making this contract, Porter represented himself and wife.   Porter stated that on his marriage he received with his wife, property about equal to the value of the negroes named in the replication, and that it would be but right to secure to her an equivalent for this; that she had a right of dower in the plantation. The trade could not have been made without Mrs. Porter's consent, and that she would not relinquish her right to dower in the plantation, unless witness would agree in writing to convey these negroes to her.   Witness did so; and she relinquished the dower.   The negroes were worth about $2,000; the dower was worth more.   The land was estimated in the trade at $14,000. After this trade was made, witness was absent from the State till the fall of 1839, when on his return he ascertained that there were many more debts and judgments against Porter, which were liens on the property, than he or Shotwell had supposed.   The contract was then modified.   Witness was to give one thousand bales of cotton for the property, divided in four

annual payments, of two hundred and fifty bales each; out of this was to be deducted some $8,000 or $9,000, received by Porter on the first contract, and Porter surrendered his right to repurchase. Witness was also bound in this second contract to convey these negroes to Mrs. Porter, she having already relinquished her dower in the land. In this second modified contract, witness was also, with the assistance of Porter, to purchase judgments against Porter, which were liens on the property, Porter being entitled to the benefit of all discounts, which was also to be deducted from the one thousand bales of cotton. Witness then thought that he was released from his liability to Mrs. Porter, if the contract should fall through by reason of Porter's failure to remove incumbrances on the land; but witness has since been advised by lawyers that she could have sued him and recover the negroes. In the winter of 1839 or '40, Porter said he was without money or credit, and could do nothing to help witness out of the difficulties he was in by reason of the numerous judgments against Porter which had come to light. It was then verbally agreed between them, that all their previous contracts should be cancelled, and they mutually released. Witness still told Porter he would convey the negroes to Mrs. Porter, if he, witness, should get out of his difficulties. He did convey them, not because he thought himself legally bound to do so, (for he thought Porter could release him without his wife's consent, had since found that he was mistaken,) but he gave them to her because he felt morally bound to do so. Porter never paid witness any thing in money, labor, or otherwise, for the negroes; nor did he furnish witness with any means to purchase each or any of the executions under which they were sold. Witness did not take possession of these negroes, though he had the legal title, because he intended to convey them to Mrs. Porter.

This, it is believed, is the substance of the testimony of Shotwell. The plaintiff below then offered to read to the jury for the purpose of impeaching Shotwell's testimony, a portion of his answer in the superior court of chancery, which, though objected to by defendant's counsel, was permitted to be read to the jury for that purpose. In this answer, Shotwell had stated as

Porter v. Duglass.

follows, to wit: " This respondent contracted with Porter for nothing, and expected nothing from him in consideration for said gift to his wife, nor did Porter and respondent enter into any fraudulent combination at the time, to injure and defraud any one; but, however strange it may seem to complainant, he made a free gift of the negroes to Mrs. Porter." The plaintiff below then offered to read a portion of the joint answer of Porter and wife in the same case, which defendant's counsel objected to, unless the whole record were offered; but the objection was overruled by the court. This answer speaks of the several contracts between Shotwell and Porter as detailed in Shotwell's testimony, and their final agreement to cancel the previous contract for the reasons stated, and states that " after he (Shotwell) had purchased the property at sheriff's sale, as aforesaid, said Shotwell gave to Mrs. E. A. C. Porter as an act of generosity, the negroes he had originally agreed to give her, and one other besides, without any consideration in law or equity, and without any preconcerted arrangement with Porter," which is all that seems material. Whereupon the court instructed the jury on behalf of the plaintiff below as follows, to wit: " If the jury believe from the evidence, that the slaves in the proceedings mentioned, were the property of D. M. Porter, and that it was agreed between Porter and Shotwell, that Porter should convey to Shotwell the slaves mentioned in the pleadings, with other slaves and land in consideration of $50,000, and that it was part of the agreement that inasmuch as Porter had received by his wife property to the amount in value of the slaves conveyed to Mrs. Porter, that Shotwell should, when his title was perfected, convey said slaves to Mrs. Porter, and that this might be done on account of her dower; that the contract was made by Porter and Shotwell before consulting Mrs. Porter, and that she agreed to what they had arranged, that such arrangement was a fraud upon the creditors of Porter, and the property as to them remained his." " If the jury believe from the evidence, that the arrangement between Shotwell and Porter was a shift or device to save for Mrs. Porter the slaves in the bill of sale mentioned from the creditors of Porter, that such arrangement was a fraud on the creditors of Porter, and

the property remained liable for his debts." " If the jury believe from the evidence, that the consideration of Shotwell's transfer of the negroes mentioned in the pleadings proceeded from Porter to Shotwell, that then the right to said negroes was vested in Porter, and liable for his debts."

And the court refused the application of defendant's counsel to instruct the jury as follows, to wit: " If the jury believe from the evidence, that in the year A. D. 1839, Shotwell proposed to purchase Porter's plantation, negroes, &c.; that Porter acted for himself and wife in the negotiations about the trade, but that the trade could not be perfected without the consent of Mrs. Porter, whose dower was an incumbrance upon the land; that Shotwell and Porter did therefore submit the trade to Mrs. Porter for her approval and she approved it; that it was a part of the contract of sale, and in writing; that Shotwell was to convey the negroes named in the replication to her in satisfaction for her claims of dower, and that Mrs. Porter did accordingly relinquish her dower to Shotwell. In such case, Mrs. Porter had a right to said negroes, and could have compelled Shotwell to convey them to her, or to pay to her their value, and no subsequent contract between Dr. Porter and Shotwell, without the consent of Mrs. Porter, could extinguish her right to said negroes, or release Shotwell from liability to her for them or their value, and such previous renunciation of dower is sufficient to support Shotwell's deed to her." " If the jury believe from the evidence, that Dr. Porter never claimed said negroes after Shotwell bought 'them under execution against him, and believed they belonged to his wife, although he may have been mistaken in this belief, they ought to find for the defendant."

Other instructions were given to the jury, on application of defendants, but it is believed they do not cover the points contained in the instructions refused.

Upon this testimony (which is substantially all the evidence in the cause), and the law as given by the court, the jury rendered a verdict for the plaintiff below for the amount of the note sued on, interest and cost.

A motion was made for a new trial, which was overruled, and Porter prayed a writ of error to this court.

The appellant assigns the following errors : —

1st. In granting the instructions asked by the plaintiff in error.

2d. In refusing the instructions asked on behalf of defendant.

3d. In overruling the motion for a new trial.

*Tupper* for appellant.

1. The only question to be tried by the jury was this, Was Porter guilty of a wilful concealment of his property or rights of property in his schedule in bankruptcy ?    All the evidence in the case, and the instructions of the court, should have been applied alone to this question.    But it is a remarkable fact, that all the instructions granted by the court for the plaintiff below have no direct applicability to this point of wilful concealment. The first instruction given by the court, especially, is an assumption that a certain state of facts amounted to a fraud upon Porter's creditors.    This was not pertinent to the issue before the jury, was not applicable to the state of the case, and was therefore erroneous.    " Charges must be given with reference to the evidence before the jury; they must be applicable to the state of the, case made out."   *Payne* v. *Green*, 10 S. & M. 510.

2. But suppose that this first instruction was applicable, does it contain a correct abstract proposition of law ?   It amounts, in substance, to the broad, naked proposition, that the contract of Porter on behalf of his wife with Shotwell, that he, Shotwell, should convey to Mrs. Porter the slaves named in the replication, in consideration of her release to Shotwell of her right of dower in lands purchased by him from Porter, was a fraud upon Porter's creditors.    Here is no shift or device to injure others ; no attempt to hinder, delay, or defraud ; no fraudulent intent even, is presumed, and yet this simple contract by itself is assumed by the court to be a fraud upon creditors.    To constitute fraud, this court have held that " there must be some device to injure others, or the act must be so grossly extravagant and wasteful as to amount to a fraud in law."   *Petrie* v. *Wright*, 6 S. & M. 647.   " It is the peculiar province of the jury to pass upon questions of fraud in fact; it is, therefore, er-

roneous for a court to predicate instructions to the jury, based upon the existence of fraud in fact, without informing the jury that it is for them to judge whether fraud exists." *Gilliam* v. *Moore*, 10 S. & M. 130.

To make out a case of fraud in fact, a fraudulent intent must be proved, and it is for the jury alone to decide upon this proof. The court may legitimately decide upon what evidence shall be adduced tending to such proof, but the jury must determine whether or not the proof establishes the charge. Thus, the first instruction of the plaintiff below is palpably erroneous, regardless of its applicability to the issue, or the question whether Mrs. Porter's release of dower is a sufficient consideration to support Shotwell's conveyance to her.

3. The court also erred in refusing the first instruction asked on behalf of the defendant. Here the question is distinctly made, Is a wife's release of dower in lands of her husband a sufficient consideration to uphold a contract made between her and a third person? We contend that the wife's right to dower in the lands of her husband is a valid existing right during her husband's lifetime. It must be admitted, also, that the wife cannot be deprived of this right, without her full and free consent. It follows, then, that this right possesses value, and may be made the basis of a contract. But is a married woman, under our law, capable of making a separate contract? This question is answered by our statute for the protection of the rights of married women, approved 15th of February, 1839, (prior to the contract between Mrs. Porter and Shotwell) which provides that "any married woman may become seized or possessed of any property, real or personal, by direct bequest, demise, gift, purchase, or distribution, in her own name, and as of her own property," &c.; directly authorizing a married woman to become possessed, by purchase in her own name, of property, personal and real. This gave full authority to Mrs. Porter to make the contract with Shotwell; and it was in consideration of Shotwell's contract to convey to her the negroes, that she agreed to and did release to Shotwell her right to dower in the land. How, then, can it be denied that Shotwell's contract was not binding upon him, and that Mrs. Porter could

not have enforced it against him? Yet such is the position of the court in refusing the instruction. Mrs. Porter was in the condition of a purchaser of the property for a valuable consideration, and her condition is not dissimilar to that of a married woman under the common law, upon whom a settlement of property has been made by way of jointure, and in bar or in consideration of her right to dower. Such settlements are held to be valid in bar of dower, and the wife is regarded as a purchaser for valuable consideration. Lambert on Dower, p. 65.

It should be remarked also, in support of the *bona fides* of this contract, that it is positively proven that the right to dower thus renounced by Mrs. Porter was worth more than the value of the negroes conveyed by Shotwell to her.

4. But we contend that the question as to the right of property to the negroes named in the replication, was not necessarily involved in this case, further than to show that Porter believed the property belonged to his wife. That question could only be appropriate in a contract with Porter's assignee in bankruptcy. The only question in this case, as before stated, was whether Porter is chargeable with wilful concealment, in failing to surrender these negroes in his schedule in bankruptcy. And this brings us to another instruction asked for by Porter's counsel, and refused by the court, which is as follows: —

" If the jury believe from the evidence that Dr. Porter never claimed said negroes, after Shotwell bought them under execution against him, and believed they belonged to his wife, although he may have been mistaken in this belief, they ought to find for the defendant."

Here the question is directly made under the issue, Did Porter know this property to be his, and therefore wilfully conceal it in the proceedings in bankruptcy? It is a plain proposition of law under the issue, and it was an undoubted right of Porter that it should go to the jury. The question before them was one of intent in rendering his schedule, as much so as it would have been had he been on his trial on a charge of perjury in the oath appended to his petition in bankruptcy. And when we examine the testimony, showing as it does the good faith that marked Porter's acts in this matter, it seems strange

Porter *v.* Duglass.

that any enlightened judge would refuse to sanction so plain a proposition.

That the issue before the jury was legitimate and proper, will be seen by reference to the 4th section of the bankrupt act, which provides that the certificate of the discharge of the bankrupt " shall, in all courts of justice, be deemed a full and complete discharge of all debts, contracts, and other engagements of such bankrupt, which are provable under this act, and shall and may be pleaded as a full and complete bar to all suits, &c.; and the same shall be conclusive evidence of itself in favor of such bankrupt, unless the same shall be impeached for some fraud or wilful concealment by him of his property, or rights of property," &c.

5. The court also erred in overruling the defendant's motion for a new trial, particularly on the ground that the verdict was against the law and the evidence.

Under the instructions, as granted by the court (particularly the 7th instruction of defendant), and the evidence in the cause, we submit that the verdict was " manifestly wrong."

In any view of the case, then, the verdict was against the preponderance of the testimony, and a new trial should have been granted. *Boke* v. *Steamer Baton Rouge,* 7 S. & M. 715; *Mc Queen* v. *Bostwick,* 12 Ib. 604, &c.

Other errors are apparent in the record; but I confidently submit that those above suggested are sufficient to require a reversal of the judgment.

As to the question whether Mrs. Porter's release of dower was sufficient to support Shotwell's contract with her. This dower interest during the life of the husband is analogous to the tenancy by the *curtesy initiate* held by the husband in the freehold of his wife during her life. This is held to be a vested estate by the marriage, and subject to sale under execution against the husband. 6 Paige, 366; 8 Ib. 643; 2 Cow. 439; 15 Pick. 260; 3 Dallas, 488; 1 Yeates, 428, &c. &c.

The consent of Mrs. Porter, in consideration of her release of dower; or if this contract were not binding, he, Shotwell, conveyed the negroes to Mrs. Porter as a gift, and without receiving any consideration therefor, in any shape, from Dr. Porter;

Porter *v.* Duglass.

Shotwell had paid a full price for the property, including these negroes, for he says, on his cross-examination, " I never have seen the time since when I would not have taken less." Porter, or his creditors, had received the full benefit of the full value of all his property, including these negroes, and they belonged exclusively to Shotwell, to do with them as he pleased. He conveyed them to Mrs. Porter, and states, in his testimony, " Dr. Porter never paid me any thing, in labor or otherwise, for the negroes named in the replication, or either of them, nor did he furnish me with any means to purchase either or all of the executions under which they were sold." The same was stated by him in substance in his answer in chancery, read on the trial. This evidence stands uncontradicted and unimpeached. Was it not, then, manifestly wrong for the jury to render a verdict, under the issue, that Dr. Porter had been guilty of a wilful concealment of his property, in failing to surrender these negroes as his own in bankruptcy, and virtually that he had committed perjury?

True, an attempt was made professedly to impeach Shotwell's testimony. But the answer in chancery, introduced for that purpose, tended rather to confirm than destroy it. But suppose this attempt had succeeded, and Shotwell's testimony had been thus destroyed, what would have been the condition of the plaintiff? The only other witness in the cause was Lamar, the material portion of whose testimony is that he saw these negroes, both before and after their sale under execution, in the possession of Dr. and Mrs. Porter. This evidence by itself would not have made out even a *primâ facie* case of fraud as to creditors, and therefore it would not have supported a verdict against Porter.

*D. Mayes* for appellee.

If a person who has conveyed his property to defraud creditors omit such property in his schedule, will it avoid his certificate of bankruptcy?

I had considered this so free from doubt, on principle, that I did not turn my attention to it in my former brief, and I presume it was for the same reason that neither the diligent and

33 *

Porter *v.* Duglass.

able counsel who managed this case in the court below, nor the other who attended to it in this court, raised the question.

By statute, Hutch. Code, 637, 638, all gifts, grants, or conveyances of lands, tenements, or hereditaments, goods or chattels, and every bond, suit, judgment, or execution, had or made and contrived of malice, fraud, covin, collusion, or guile, to the intent or purpose to delay, hinder, or defraud creditors, &c., are declared as to such creditors to be clearly and utterly void. The property thus conveyed, so far as the creditors are concerned, remains to all intents and to every purpose the property of the alienor. The bankrupt law provides that the certificate, when duly granted, shall in all courts of justice be deemed a full and complete discharge of all debts, &c., and may be pleaded as a full and complete bar to all suits brought in any court of judicature whatever, and the same shall be conclusive evidence of itself in favor of such bankrupt, unless the same shall be impeached for some fraud or wilful concealment by him of his property, or rights of property, as aforesaid, &c. The object was to compel a disclosure of all the property or rights of property of the bankrupt, subject to the payment of his debts.

Property so fraudulently conveyed, is for that purpose as much his property as though it had never been conveyed. Therefore, the omission of such property in his schedule, must have the same effect that its omission would have had if it had never been conveyed.

A. conveyed to his father, apparently for a valuable consideration, certain real and personal property, but retained possession of it in 1838. In 1840 the real property was sold under execution against A., but no deed was given to the purchaser. In 1842 A. was discharged in bankruptcy. He pleaded his discharge to a writ of *scire facias* to revive a judgment obtained in 1838, and it was held, that while his discharge could be pleaded in all courts, it could be impeached for fraud or wilful deceit in obtaining it, and his retaining possession of the property, which he pretended to have sold to his father and did not include in his inventory, raised a presumption of fraud, on which a verdict of a jury that it was a fraud, was sustained.

Porter *v.* Duglass.

The *State* v. *Bethune*, 8 Ired. 139; *Saunders* v. *Smallwood*, Ib. 125.

In *Crooker* v. *Trevett*, 28 Maine (15 Shepl.), 273, it is held, that if a person to secure his property, so that it shall not be taken in payment of his debts, does, by solemn instrument, transfer it to a friend, expecting to have the use of it, he may with propriety consider it the property of that other, although *bonâ fide* it is otherwise, and that if he omit it in his schedule, it is a fraud which avoids his certificate; and the judgment of the inferior court was reversed, because that court instructed the jury that if the bankrupt did not consider the property his own they should find for him.

The case of *Coates* v. *Blush*, 1 Cush. 564, may shed some light on the subject. It was there conceded on all hands, that every act which was a fraud at the common law, would vitiate the certificate. The only controversy was, whether a fraud upon the bankrupt law would have the same effect.

I have been able to find no case adverse to my view of the subject. If the creditor, where property has been fraudulently conveyed, is barred by the certificate of bankruptcy, he cannot obtain a judgment. He must obtain a judgment before he can institute a proceeding in the ordinary tribunals of the country against the fraudulent purchaser to subject the property fraudulently conveyed, in the hands of such purchaser, and thus, Shotwell will be effectually secured in the immense estate acquired by him in fraud of the creditors of Porter, and the effect of the bankrupt law will be to render valid and effectual a fraudulent and void transaction.

But it may be said that Shotwell acquired the title by the execution sale, that he conveyed to Mrs. Porter the property mentioned in the replication, and that she could not be affected by the fraud. But the evidence shows that the consideration passed from Porter. She was therefore but his trustee, and the property subject to his debts. Hutch. Code, 610. It also appears that she was but a volunteer, and a party to the fraudulent arrangement.

I would ask the court's attention to the paper copied in the

record, which purports to be a bill of exceptions, if it can be considered one, as there does not appear on the minutes any entry that such exceptions were taken.

Mr. Chief Justice Smith delivered the opinion of the court.

This writ was brought, in the circuit court of Madison county, on a sealed note, by William Montgomery, for the use of Robert B. Duglass against David M. Porter, the plaintiff in error, and W. P. Anderson.

The defendant Porter pleaded his certificate and discharge in bankruptcy under the act of congress passed in 1841, in bar of the action. The plaintiff replied, and in his replication stated that the defendant, in the schedule of property and rights of property rendered by him in bankruptcy, failed to surrender certain property, particularly described in the replication, which was at the time of filing his said petition the property of the defendant; and, as such, ought to have been surrendered by him for the benefit of his creditors; averring that the failure of the defendant to surrender said property was a wilful concealment of the same, contrary to the provisions of the said act of congress. Issue was joined on the replication, and the cause having been, upon that issue, submitted to the jury, a verdict was rendered for the plaintiff. A motion for a new trial was made, which was overruled. A bill of exceptions was filed to the judgment on the motion; and a writ of error sued out to this court.

Before we proceed to consider of the questions which arise upon the merits of the case, we will dispose of the objections which are raised to the bill of exceptions.

It is said, in the first place, that this court cannot notice the contents of the bill of exceptions, because it does not properly constitute a part of the record.

We think this objection untenable. The bill recites the motion for a new trial, sets out the reasons in support of the motion, the judgment on the motion, and shows that the exception was taken during the term of the court at which the verdict was rendered. This was unquestionably sufficient.

Whether the bill was or was not sealed by the judge and filed during the term of the court, are matters which it is incompetent for us to inquire into, upon the suggestion of counsel.

In the next place, it is insisted that the bill of exceptions does not profess to set out all of the evidence or the substance of the evidence; in fact, that it does embody the evidence, but contains a statement of " the facts which appeared in evidence " on the trial. This objection is also not tenable.

When a bill of exceptions purports to set out the evidence in a cause, it is presumed that it contains the whole of the evidence, or the substance of the evidence, as required by the statute; unless the contrary expressly appears from the bill, or from some other part of the record. It is certainly no objection that the bill contains the facts which appeared in evidence, instead of the evidence itself. If the facts of a cause were admitted and established by the agreement of the parties litigant, it would constitute quite as good a foundation on which to base the judgment of the court, as the facts established by the evidence would be. In the case before us, however, the bill of exceptions is not to be understood as professing to contain a state of facts admitted by the parties, but as purporting to set out the evidence in the case.

Passing by several exceptions taken to the action of the court, and which stand first in order, we will proceed to the consideration of the main question in the cause, that is, whether the failure or omission (which is admitted) of the defendant to surrender upon his schedule the slaves described in the replication of the plaintiff, was guilty of a wilful and fraudulent concealment of his property or rights of property, in contravention of the act of congress of 1841 in regard to bankrupts.

It appears from the evidence that the defendant Porter was in the possession of and owned a tract of land in Madison county, containing fourteen hundred acres, and some thirty-odd slaves, with stock, and other articles of property usually attached to a cotton plantation, which, in the spring of 1839, he sold to Robert Shotwell, for $50,000. The negroes sold to Shotwell included those named in the replication. Shotwell was to pay $36,000 in the notes of different individuals, and

the remainder of the purchase-money was to be paid in the liabilities of Porter, which Shotwell was to take up. Porter executed a deed of conveyance for the property, which was duly recorded. Porter, at the time of the conveyance, or soon thereafter, took from Shotwell a written obligation, by which he was entitled to repurchase the property within eight years from the date of sale. Porter, in making the contract for the sale and purchase of the land and slaves, acted for himself and wife. Porter stated, that on his marriage he had received with his wife property nearly equal in value to the negroes named in the replication, and that he thought it but just, as Mrs. Porter was entitled to dower in the land, that Shotwell should transfer to her in consideration therefor the said slaves. Mrs. Porter would not consent to relinquish her dower unless Shotwell would agree in writing to convey to her the said slaves, and the trade could not have been made unless Mrs. Porter had agreed to relinquish her dower in the land, which was worth more than the slaves. Shotwell consented to this proposition, and bound himself in writing accordingly.

The slaves sold by Porter to Shotwell, including those specified in the replication, were taken to Canton and sold by the sheriff, under executions against Porter; at which sale Shotwell purchased the whole of them. In the fall following, Shotwell having ascertained that liens of which he had no knowledge when he made the purchase existed against Porter's property; in consequence of this a new contract, or a modification of the original one, was made by Porter and Shotwell, by which Shotwell was to give for the property one thousand bales of cotton, in four annual payments, of two hundred and fifty bales each; out of this, however, was to be deducted some $8,000 or $9,000, which Porter had received under the first contract. In this new contract, Shotwell bound himself to convey the said slaves to Mrs. Porter, who had, pursuant to the original contract, relinquished her right to dower in the land. Shotwell was also bound, with Porter's assistance, to buy up the judgments which were liens on the property; allowing Porter the benefit of all discounts on the same; the amounts expended in the purchase of the judgments to be deducted from the value

of the thousand bales of cotton. In the winter of 1839 or 1840, Porter being without money or credit, declared himself unable to assist Shotwell in relieving the property from the numerous judgments against Porter which had then come to light. It was then agreed that they should mutually release each other, and that their previous contracts should be cancelled; Shotwell still promising to convey to Mrs. Porter the said slaves, provided he should get out of his difficulties. The slaves were conveyed by Shotwell to Mrs. Porter, as her separate property, by deed which was duly acknowledged and recorded. He conveyed them not because he thought himself legally bound to do so, for he believed Porter, without the consent of his wife, could release him from his contract to do so, but because he felt morally bound. Porter did not pay for the slaves in money, labor, or otherwise, nor did he furnish the money or means with which the executions were purchased under which the slaves were sold. Shotwell did not take possession of the slaves named in the replication, but they were left in the possession of Mrs. Porter.

On this state of facts, whether the sale made by Porter to Shotwell, was or was not void as to the creditors of the former, it is clear that Mrs. Porter, by virtue of the conveyance to her and her subsequent possession under it, acquired a valid title as against Porter or Shotwell. By the sale to Shotwell, and especially by the sale made under the execution, Porter was divested of all right or title to the slaves; and the conveyance by Shotwell as effectually deprived him of all claim to them.

The conveyance to Shotwell of the property and the sale of it, made under the executions, occurred nearly two years before the passage of the bankrupt act. It is manifest, therefore, that these transactions, however unfair they may have been, were not frauds committed in view of the enactment of the statute, nor in violation of its provisions. 5 U. S. Statutes at Large, 442, c. 9, § 2.

Where a party has been by a decree of the proper court declared a bankrupt, all his property and rights of property of every description, whether real, personal, or mixed, are " by mere operation of law, *ipso facto*, from the time of such decree,

deemed to be divested out of such bankrupt without any other act, assignment, or other conveyance whatsoever," and are vested, by force of the same decree, in the assignee, who is empowered " to sell, manage, and dispose of the same;" and to sue and defend in all cases, subject to the orders and directions of the court, "as fully to all intents and purposes as if the same were vested in, or might be exercised by, such bankrupt, before or at the time of his bankruptcy, declared as aforesaid." U. S. Stat. at Large, 43, c. 9, § 3.

It is manifest under these provisions of the statute, that the assignee could not maintain any action to recover property conveyed by the bankrupt before the decree which the bankrupt himself could not maintain, if there had been no decree in bankruptcy, except in the cases specified in the second section of the statute, however fraudulent and void as to creditors such conveyance may have been. That section provides that all future payments, securities, conveyances, or transfers of property, or agreements made or given by any bankrupt, in contemplation of bankruptcy, and for the purpose of giving any creditor, indorser, surety, or other person, any preference or priority over the general creditors of such bankrupt; and all other payments, securities, conveyances, or transfers of property, or securities made or given by such bankrupt, in contemplation of bankruptcy, to any person or persons whatever, not being a *bonâ fide* creditor or purchaser, for a valuable consideration without notice, shall be deemed utterly void, and a fraud upon this act, " and the assignee under the bankruptcy shall be entitled to claim, sue for, recover, and receive the same as part of the assets of the bankruptcy."

Porter's interest and title to the slaves in question were completely divested by his conveyance and the execution sales. Hence no title as to them could vest in the assignee, by virtue of the decree in bankruptcy, as he succeeded only to the rights which Porter then possessed. The transfer and the sales under execution were not made in contemplation of the passage of the act, nor in violation of its provisions, consequently, upon the hypothesis that these transactions were fraudulent and void as to the creditors, the assignee could not have recovered them from

Porter *v.* Duglass.

Shotwell as assets belonging to the bankruptcy. The question arising upon the issue, was not whether the property was liable in the hands of the vendee for the debts of Porter, but whether in rendering this schedule, his omission to include the slaves was an act of wilful concealment of his property, or rights of property.

There is a clear distinction between the right which a person may claim to recover property in the possession of another, and the right of the creditors of the claimant to subject the same property to the payment of their demands. A conveyance made without consideration, or upon one that is fraudulent, is valid between the parties, hence the vendor is debarred of all right to recover back the property; but as to creditors, it is void, and will not prevent them from subjecting the property conveyed to the payment of their claims. Hence, in the case at bar, the slaves may have been liable in Shotwell's hands for Porter's debts, but for that reason alone the assignee who stood in the place of Porter, would not have the right to sue for and recover them. Upon this view, the question at issue must be tested by the right of the assignee to recover the property in question from Mrs. Porter. This is evident; for if the assignee was not entitled to sue for and recover them as assets of the bankruptcy, Porter was under no obligation to surrender them in his schedule.

The distinction between the right of the assignee to sue for and recover the slaves, as assets of the bankruptcy, and the right of the creditors to subject them to the payment of their demands, appears not to have been considered by the court in charging the jury. The question, whether the defendant had been guilty of a fraudulent and wilful concealment, was made to depend upon the question, whether, on account of the alleged fraud, the property was liable for his debts. The instructions, hence, laid down an incorrect rule for the guidance of the jury; and we shall be compelled to reverse the judgment, unless upon the facts of the case the verdict was correct.

If the view we have taken of the act is the proper one, it would not admit of question, if Shotwell had retained possession of the slaves named in the replication, or had transferred

them to any other person than Mrs. Porter, unless upon an express or secret trust for the benefit of Porter, that the assignee would not have been entitled to recover them; and hence upon the rule laid down, the omission to enter them on the schedule was not an act of wilful concealment of his property or rights of property on the part of Porter. But Shotwell conveyed the slaves to Mrs. Porter, who holds them as her separate estate; and it remains to be ascertained, whether that fact can have any effect upon the rights of the parties.

We are of opinion that the conveyance from Shotwell to Mrs. Porter did not vest Porter with any title or right of property in the slaves conveyed; and hence that they could not have been recovered from Mrs. Porter by the assignee, to whom they were conveyed " in her own right, as her individual property, with the right to sell, give, or convey the same to whom she might please."

Porter, as the husband, was entitled to the possession by virtue of his marital rights; and would in equity be considered as holding it in the character of trustee for the wife. As such, he was not entitled to appropriate the slaves themselves, or the proceeds of their labor, to his own use, without her consent. No presumption could arise from the fact of his possession alone, which could warrant the conclusion that the property was his, or that he held a secret trust in it. If the consideration, as it is insisted, upon which the conveyance was based, passed from Porter, the property might have been reached by his creditors; but, as we have shown, the rights on the part of the creditors to subject the property may have existed, although Porter had been divested of all right or title.

An attempt was made to impeach the witness offered in behalf of the defendant. Why this attempt was made we are unable to imagine. For if the testimony of this witness were disregarded, the record would present a clear case in favor of the defendant. Without the testimony of this witness, the record would show that Mrs. Porter claimed under the deed from Shotwell, who purchased these slaves at the sheriff's sale, without a suspicious circumstance attending the transaction. But whatever may have been the opinion of the jury in regard

Porter *v.* Duglass.

to the credibility of this witness, from the facts as they appear in the record, we think the effort to discredit was made without success. Taking then the whole evidence, it is at least extremely doubtful, whether the consideration did actually pass from Porter. In the first contract, Shotwell agreed and bound himself, in a written obligation, to transfer the slaves to Mrs. Porter when the title should be made perfect in him. If the witness is to be believed, the consideration of his agreement was the relinquishment of her right to dower in the land, which, according to the same witness, was worth more than the slaves. The witness thought that he had been released from his agreement by the subsequent alterations made in the original contract between him and Porter. But Mrs. Porter, in pursuance of the original agreement, had relinquished her dower, and if Shotwell's promise to convey the property to her was, in fact, made upon that consideration, it was undoubtedly valid, and could have been enforced. Upon a full view of the subject, we are of opinion that the evidence did not establish a "wilful concealment" by the defendant, "of his property or rights, or rights of property."

The reasons assigned by the court for the judgment in the case of *The State* v. *Bethune et al.*, 8 Ired. 139, cited by counsel, appear at first view to be in conflict with the rule above laid down. That was a case arising under the same statute. A judgment was rendered against the defendant in 1838, who was discharged as a bankrupt in 1842. In 1847, a *scire facias* to revive the judgment was sued out, to which the defendant pleaded his discharge and certificate as a bankrupt. The plaintiff replied that he had conveyed his property for the purpose of hindering and defeating his creditors, and that he had fraudulently and wrongfully omitted to render a correct schedule of his property. The proofs showed that before the judgment was rendered, the defendant had conveyed to his father, land, a wagon, four horses, and gear, without consideration, or for a very inadequate one; and that he had retained the possession from the time of the sale for nine years, the vendee never having set up any claim to the property during such possession.

Unquestionably, the verdict and judgment which were ren-

dered for the plaintiffs were correct, upon the pleading and proofs. The plaintiff's replication put in issue the *bona fides* of the sale and conveyance. This was, according to what we deem the just construction of the statute, unnecessary and improper. The possession, unexplained, of personal property of the description shown by the evidence, for so long a time, was undoubtedly sufficient to raise the presumption of the fraud in the sale which was averred in the replication. The question whether the sale was fraudulent or not, was the point chiefly considered by the supreme court. The true ground, however, is stated in the opinion, which was, that " a possession, derived from a father, of a wagon and team, where continued so long, is by presumption of law a gift, unless the contrary distinctly appears." If title by donation was the legal presumption arising from the possession, under the circumstances detailed by the evidence, the jury and court were justified in the conclusion that there had ·been a wilful and fraudulent concealment of his property by the bankrupt. That case is, therefore, not an authority, in opposition to the doctrine which we have above laid down.

Let the judgment be reversed, the cause remanded, and a new trial awarded in the court below.

HANDY, J., having been connected with this case in the court ·below, gave no opinion.

A petition for a reargument was filed in this case by the ·counsel for the appellee, but the court refused to grant a reargument.